McCALEB, Judge
(dissenting).
This case is on all fours with Wampler v. Wampler, 239 La. 315, 118 So.2d 423 and the district judge and the dissenting judge of the Court of Appeal were correct in concluding that the Wampler matter should control the decision herein.
The majority view of this Court adopts, in essence, the reasoning of the prevailing opinion of the Court of Appeal, which attempts to distinguish this case on its facts from Wampler v. Wampler. But, in my judgment, the asserted differentiation is tenuous, being founded on an erroneous conclusion of fact and a misapplication of the law. Let me demonstrate.
The substance of the Court of Appeal’s deduction that the Wampler case is distinguishable from the instant matter is that, there, Wampler had not paid Corley for the assignment because Corley had not yet delivered a merchantable title at the time the divorce was granted whereas, here, “ * * * Lewis had obtained and delivered to Marks all of the leases which he had agreed to obtain, and Marks in turn had executed the assignment of an overriding interest in favor of Lewis, which constituted the consideration he had agreed to pay Lewis, for these leases. Neither party' was obligated to do anything further,. * * * (Italics mine.) See 150 So.2d p. 799.
I submit that the above quoted statement shows that the Court has misconceived the facts of the case.[1] For it is not true that Lewis had done everything required of him by the agreement at the time he delivered to Marks all the leases which he had agreed to secure. On the contrary, while he had delivered a title purporting to . assign the seventy-five percent working interest, it was not known at that time that said title was legally or factually merchantable. Implicit in the agreement between Marks and Lewis was the understanding that the mentioned working interest in the mineral leases Lewis was to secure for Marks would be evidenced by a merchantable title and payment of the recompense which Lewis was to receive from Marks for his services (the assignment of an overriding royalty interest in the leases) was conditioned on the happening of an event, i. e., — approval by Marks’ attorney of the legálity and merchantability of the titles obtained by Lewis. So, when Lewis delivered the promised working interest in the leases, he had not yet fulfilled his obligation; the contract was still executory and Marks was not liable thereon until he was afforded a reasonable time to have the title to the property examined. This was the very reason for placing in escrow the instrument conveying the three percent overriding royalty to Lewis.
To conclude, then, that title to this royalty passed to Lewis (and this is necessary for the result reached herein), when Marks executed the royalty instrument and delivered it to his attorney with instructions to turn it over to.Lewis when and if the lease title secured by Lewis was merchantable, is not only opposed to the intent *136 clearly manifested by the parties to the contract but is, in my opinion, at odds with our codal law on conditional obligations (see Articles 2021 through 2047 of the Civil Code) and the prior jurisprudence. If title passes to the creditor without delivery when an instrument is placed in the hands of a third person then, indeed, escrows are of little or no efficacy in Louisiana. But, legally and factually, title did not pass in the instant case for it is manifest that Lewis could not have lawfully alienated the royalty interest, an incorporeal immovable, while the instrument evidencing it remained in the possession of Mr. Maxwell. This is because delivery of title to immovables is essential to a transfer or assignment (see Article 2479 of the Civil Code) and until Mr. Maxwell turned over the royalty interest to Lewis in compliance with the escrow agreement the latter did not become the owner thereof. Suppose the consideration for Lewis’ services had been currency — would Lewis have become the owner of the currency before Mr. Maxwell delivered it to him? I think not.
It is also to be noted that the Court of Appeal’s conclusion — that the escrow agreement in this case, unlike that in the Wampler case, depended for its execution on a resolutory and not a suspensive condition — is stated by the majority opinion herein to be “* * * a proper evaluation of the status in law of the obligations involved in the two cases, and their effect.” I, however, submit that the Court of Appeal again faultily reasons that the condition of the escrow was resolutory “ * * * because both parties had performed all obligations which they had assumed * * * Aside from the fact, as I have above pointed out, that Lewis had not yet tendered a title which was then known to be merchantable, it is clear that Marks’ execution of the overriding royalty assignment did not vest ownership in Lewis at that time because the assignment was not delivered to Lewis but, instead, put in escrow to be held until the leases obtained by Lewis could be examined and determined to be merchantable. This was a condition, mutually agreeable to both parties, which depended for its fulfillment on a future event, i. e., determination by the purchaser’s agent, Marks’ attorney, that the leases were merchantable. This is patently a suspensive condition, which is defined by Article 2043 of the Civil Code, inter alia, as one depending on a future and uncertain event.
An escrow agreement is the antithesis of a resolutory or dissolving condition which, as defined by Article 2045 of the Civil Code, operates a revocation of the obligation when accomplished. The Article further states “It does not suspend the execution of the obligation (as in the case of an escrow) ; it only obliges the creditor to restore what he has received, in case the event provided for in the condition takes place.” (Clause in parenthesis mine.)
By Article 2046 of the Code “A resolu-tory condition is implied in all commutative contracts, to take effect, in case either of the parties do not comply with his engagements; in this case the contract is not dissolved of right; the party complaining of a breach of the contract may either sue for its dissolution with damages, or, if the circumstances of the case permit, demand a specific performance.”
Thus, in the case at bar if Marks, instead of placing the royalty assignment in escrow, had delivered it to Lewis and it had been subsequently ascertained that the mineral lease titles secured by Lewis were not merchantable, a resolutory condition would have been present and Marks could sue for a cancellation of the royalty assignment. But, to repeat, Marks did not deliver the royalty assignment to Lewis prior to the date of the judgment of separation but placed it in escrow and it was not delivered until after the judgment was rendered.
Finally, it appears that, albeit this Court quotes with approval the finding of. the *137 Court of Appeal that the condition under which the overriding royalty deed was placed in escrow on October 26, 1959 was resolutory and not suspensive, the majority nevertheless concludes that the escrow agreement was dependent for its fulfillment on a suspensive condition of a different sort from the one presented in the Wampler case.
For my part, I fail to perceive the factual difference between the cases for in each case the deed was placed in the hands of the attorney for Wampler and Marks to be held in escrow until the attorney could examine the title to the leases which had been tendered and determine that said title was legally merchantable.[2]
In addition, I believe the majority opinion is clearly erroneous in its holding that Marks’ obligation herein was contracted on an event which had actually taken place without its yet being known to the parties and, therefore, such obligation, i. e., the overriding royalty deed, had effect from the day on which it was executed (October 26, 1959) in accordance with the last clause of Article 2043 of the Civil Code. The theory of this «resolution is and must be that the condition for the giving of the overriding royalty deed went into effect immediately on its execution because it was later ascertained by Marks’ attorney that the titlés to the oil leases delivered by Lewis were legally merchantable.
The flaw in this deduction, so it seems to me, is that it assimilates the fact that Lewis had obtained' a merchantable title to “an event” which had actually taken place without it being yet known to the parties, as provided by the Civil Code. But the fact that the title that Lewis secured was merchantable was not the event on which the escrow agreement was founded. On the contrary, the future event on which the placing in escrow of the royalty deed was conditioned was the ascertainment by Marks’ attorney that the titles to the oil leases were merchantable for the parties agreed that said attorney was not to deliver the royalty deed to Lewis until the happening of that future event.
Article 2043 of the Civil Code, insofar as it treats of agreements dependent on an event which has actually taken place, is merely declaring that such an agreement is not dependent on a suspensive condition.[3] The suspensive condition in this case, however, while primarily contingent upon Lewis’ procurement of a good title to the leases, was ultimately dependent for its fulfillment upon a future event, i. e., approval by Marks’ attorney that the titles; delivered were merchantable.
I respectfully dissent.

. See the comprehensive minority opinion of Judge Culpepper in 150 So.2d 801-804 which clearly exposes the flaw in the majority view of the Court of Appeal.

. It is true that, in the Wampler ease, all of the owners had not signed the leases when they were put in esei-ow. Likewise, the record in this case shows that, at the time the royalty deed was put in escrow, there was certain curative work required to be performed to make the leases obtained by Lewis merchantable. See dissent of Culpepper, L, 150 So.2d at page 803. But, be this as it may, the condition on which the obligation was dependent for fulfillment was in each case the same, viz. — approval of the attorney that the title was merchantable.

. Article 2043 of the Civil Code is substantially a counterpart of Article 1181 of the Code Napoleon. And in this connection the comments of Planiol in his “Traite Blementaire De Droit Civil”, Yol. 1, Part 1, No. 309, pg. 211, are pertinent: “Common Characteristics of the Term and the Condition.” “Their common nature consists in the fact that the event chosen by the parties to affect it must always be a future event. If, as the result of an error, the parties have referred! to a past event, either as a term or as a condition, their juridical act would, in reality, not be subject to a condition. If the event took place as intended, the juridical act is pure and simple, because nothing suspends it or limits its duration. If the event was contrary to what they had in mind, the juridical act produces no effect and will never do so, because, from the moment of its inception, there was according to the expressed will of the parties a fact which prevented it from coming into being. Art. 1181 is therefore in error, for it assumes that an event which has already happened but is unknown to the parties can play the role of:. a condition.”